Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



SAUL ROMERO,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-05-00005-CR

Appeal from the

168th District Court

of El Paso County, Texas

(TC# 20040D00902)




O P I N I O N

           This is an appeal from jury convictions for three counts of aggravated assault with a
deadly weapon, (Counts One through Three), and one count of deadly conduct (Count Four). 
The jury assessed punishment at fifteen years’ imprisonment and a $5,000 fine on Count
One, five years’ imprisonment and a $2,000 fine on Count Two, two years’ imprisonment
and a fine of $2,000 on Count Three, and eight years’ imprisonment and a fine of $5,000 on
Count Four. We affirm the judgment of the trial court.
I. SUMMARY OF THE EVIDENCE
           Prior to trial, Appellant objected to the anticipated evidence that Appellant had given
a sum of money to one of his companions to buy cocaine from Sidina Mobley who was
nicknamed “Precious.” Appellant wanted to avert any mention of a drug deal. On the day
of trial, the court ruled that the State could refer to activities that led up to searching for
Mobley, but could not refer to the possible use of counterfeit money or cocaine. Appellant
argued that even with these restrictions, the evidence was more prejudicial than probative. 
The court overruled this objection.
           The offenses involved were alleged to have occurred on or about December 2, 2003
in El Paso County, Texas. Around that date, Sergio Diaz testified that he picked up
Appellant between 5 p.m. and 6 p.m. to go to a house were a woman named Monica lived. 
Diaz characterized Monica as being Appellant’s wife.


 Diaz, Appellant, and an individual
named Victor Devora were in the car. When they arrived at the house, they picked up
Monica’s brother, Jose Borjon, known as “Junior.” They drove to a store to meet up with
some of Junior’s friends in order to buy what was characterized as “product” at trial. After
going to various stores and a fast food outlet, they stopped at a Wendy’s restaurant. Junior
had changed vehicles and was in a tan Explorer. They parked on one side of the restaurant
and Junior went to the other side to get the product. He phoned back to the car that a girl was
walking to their side, she had the money, and she was going to get the product. Diaz saw her
get into a blue BMW and leave. He described the girl as being black. They were unable to
follow the car, and they returned to the Wendy’s to get Junior. It became apparent to Diaz
that Appellant’s money was used to try to purchase the product. Junior and Appellant were
arguing and Appellant was upset with Junior that the girl had left without providing the
product. They continued the search to no avail.
           They drove to Diaz’ house and changed cars. They drove off in Diaz’ red Mustang. 
They went to Appellant’s house were he got a gun. Appellant had the gun tucked into his
pants and covered with his shirt. Appellant got into the car and stated that he was going to
scare the people in the BMW in order to get the money back. Monica called and they met
her at a bar called Tequila Sunrise. The BMW was there and Appellant spoke to two
individuals who were friends with Monica. They agreed to follow the BMW when it left the
bar. Diaz, Appellant, Junior, and Devora waited at Monica’s house to hear from the
individuals in the white car. They got a call and they went to the stated location. Diaz was
driving the Mustang, Appellant was in the passenger’s seat, Junior was behind Appellant, and
Devora was seated behind Diaz. They saw the white car blocking the BMW at a stop sign. 
Someone got out of the BMW and threw a can at the white car. Diaz drove up next to the
BMW and started driving side-by-side. He heard gunshots and he saw that the windows in
the BMW were shot out and it was swerving. Diaz saw Appellant get back into the car from
the window. He had the gun in his hand. Appellant threw the gun out of the window. They
proceeded to Monica’s house, and Devora took Diaz’ car back to his house, and Appellant
took Diaz home in Monica’s truck.
           Victor Devora testified that on the day of the shooting, Sergio Diaz came by and took
him out to eat. They drove to a Burger King restaurant. Devora, Sergio Diaz, Appellant, and
Junior were in a white Honda. At the restaurant, Devora went inside to eat and the others
remained outside. Later, Devora met up again with the same individuals. Appellant
appeared angry, and Junior seemed worried. Appellant asked Junior “why had he given it
to him” or her.
           Devora and the others drove to some apartments, strip clubs, and bars, and then went
to pick up a red mustang belonging to Diaz’ mother. They then went to Appellant’s house. 
Only Appellant went inside, and Devora was unaware of why Appellant went into the house. 
They then proceeded to the Tequila Sunrise bar. There, Appellant and a woman Devora
knew as being Appellant’s wife waited in the parking lot for the arrival of someone. Devora
joined them as they stood with two other individuals in front of a white car. They then went
to Junior’s house for a phone call. After receiving a call, they went to a location where the
white car and the BMW were stopped at a traffic light. Diaz was driving, Appellant was in
the front passenger seat, Devora was seated behind the driver, and Junior was behind the
Appellant. The Mustang traded places with the white car behind the BMW. After initially
losing sight of the BMW, they came across the BMW and the white car. Someone from the
BMW was fighting someone from the white car. The BMW took off leaving its passenger
behind. The Mustang pulled up on the right side of the BMW. Devora saw Appellant put
his hand out the window and start shooting. He bent down and did not see anything else. He
did not think Junior was shooting. He never actually saw a gun.
           They went back to Junior’s house, and Devora asked if he could take the Mustang in
order to go home. He took it to Diaz’ house and then went home. He did not talk to the
others afterward about the incident as he was afraid of them. He did not know anyone in the
car had a gun, and he was not involved in the shooting. He was never arrested for the
offense.
           Regina Lauren Rendon testified that she was Jose Borjon’s (Junior’s) girlfriend. 
Appellant was Monica Borjon’s boyfriend and Rendon knew Appellant from that connection. 
Earlier in the day of the shooting, she was helping Monica move into her father’s house. 
Junior was assisting. Later, Appellant and Diaz and Devora came to help. Those three left
and returned later. While she did not understand Spanish, she was able to discern that Junior
wanted to find a girl named “Precious” because Appellant’s money had been taken. Rendon
and Monica went to the Tequila Sunrise bar and obtained what she referred to as “product.” 
Monica spoke to an individual named Eric who was driving a white car. Rendon and Monica
were looking for a BMW because someone named “Precious” was in the vehicle. The two
then returned to Monica’s house.
           Leslie Saenz testified that on the day of the shooting, she was in the process of
moving. Rick Gomez, Sidina Mobley, and Rick Dominguez, who was known as “Watts,”
were helping her. Sidina’s nickname was “Precious.” Mobley persisted in saying that she
wanted to go eat. After dropping off a load in the U-Haul truck, they stopped at a
McDonald’s restaurant. Mobley got out of the car to make a phone call. She then walked
to a nearby Wendy’s restaurant.
           When they returned to the house, Mobley went into another room to talk on her phone
and the phone kept ringing all night. They returned the U-Haul truck and they went out to
eat. Mobley told Saenz that she was afraid to go home and she asked the others if she could
spend the night with them. She received a negative answer. They then went to the Tequila
Sunrise bar to get one beer. Mobley “went crazy” buying drinks for everyone. She was
trying to go out with some men so that she could stay with them.
           When they left the bar, it was their intention to go back to Saenz’ house to get Rick
Dominguez’ car in order to proceed to Gomez’ house. Gomez was driving the BMW, Saenz
was in the passenger’s seat, Mobley was behind her, and Dominguez was behind the driver. 
Gomez stated that he thought someone was following them. While Gomez made a turn, a
white car almost ran into them. Someone was hanging outside the passenger side window. 
Saenz stated that she was intoxicated and she did not know how many people were in the
other car. It appeared that rocks were being thrown. Dominguez jumped out of the car. 
Gomez stated that someone was shooting at them. Gomez released Saenz’ seatbelt and
pushed her head down. A bullet came into the car, grazed Saenz’ head, and hit Gomez. 
Gomez accelerated, but he had been paralyzed, and he needed Saenz’ help to stop the car. 
They narrowly avoided hitting some gas pumps at a convenience store. A woman at the store
called the police. Saenz was unable to identify anyone with a gun.
           Rick Dominguez also helped Saenz to move. After they finished moving, Dominguez,
Saenz, Mobley, and Gomez went to eat. They then went to the Tequila Sunrise bar for a
drink. Mobley kept on buying them all drinks. She did not want to go home. When they left
the bar, Dominguez saw a white car driving by on the opposite side of the street and someone
was hanging out the passenger-side window. Someone in the white car threw something at
the car Dominguez and his friends were in. Gomez stopped and Dominguez got out of the
car. Gomez drove off and four individuals got out of the white car. Dominguez jumped over
a wall to escape them. The individuals in the white car left. Dominguez had no reason to
believe that anyone was after him or the others.
           Ricardo Gomez testified that he also helped Saenz move. When they had returned the
U-Haul truck, they all went out to eat and then went to the Tequila Sunrise bar for a beer. 
Mobley started buying drinks nonstop and it appeared that she had a lot of money. She did
not want to leave and they stayed at the bar until about 1 a.m. Gomez was driving, and Saenz
was in the front passenger seat. Mobley was behind Saenz, and Dominguez was seated
behind Gomez. As he was driving Dominguez home, Gomez noticed that a white car was
following. The white car cut them off. A bald-headed individual was sitting on the window
of the white car. It was an individual he had seen outside the Tequila Sunrise bar that night. 
Something was thrown at the BMW Gomez was driving. Gomez saw that the man sitting on
the window had a gun. He fired several shots but the shots did not hit them. Just as Gomez
drove around the white car, a red car came up on the right side of Gomez’ car. Shots were
fired and one bullet hit a door lock on the BMW. He stated that he saw a flash from where
he guessed was in the back of the driver. Gomez accelerated. Then he told Saenz to get
down just as he was shot. Saenz said she was shot in the head, and Gomez knew he was shot
because he could not feel his legs. He told Saenz to get his foot off the accelerator, and the
car pulled into a gas station. As ambulance transported Gomez to the hospital. He was
paralyzed from the chest down.
           On cross-examination, Gomez said that he was unable to identify Appellant as the
shooter. He stated that the red car was to the right of his when the shots were fired. He saw
a flash, but because he was accelerating, he could not tell where the shot came from.
           Dionicio Romero, Appellant’s brother, testified for the defense. He stated that at the
time of the offense, he, Appellant, a friend, and some other brothers were working in
Tularosa, New Mexico doing construction work. The crew would leave El Paso at about five
o’clock in the morning and they would return to El Paso at six o’clock in the evening. The
witness testified that Appellant had worked the entire week after the Thanksgiving holiday. 
           Margarito Nevarez related that he worked on the construction crew. He testified that
all members of the crew, including Appellant, worked the week following the Thanksgiving
weekend.
           Socorro Romero, Appellant’s mother stated that Appellant was living at home with
her around Thanksgiving time. She woke him up to go to work at 4 a.m. on both Monday,
December 1, and Tuesday December 2. A woman named Carla was with him. On Monday
night, he got back at 6 p.m. She saw Appellant and Carla watching a movie at 9 p.m.
           Carla Hernandez testified that after spending the Thanksgiving holiday with her
friends and family, she went to Appellant’s house on Monday at about 6:30 or 7 p.m. She
ate and visited with Appellant’s family. She and Appellant went to his room and watched
movies until they went to sleep at 1 or 2 a.m. She had seen Appellant’s mother at 9:30 p.m.
earlier that night. Appellant stayed with her the whole evening until his mother woke him
up at 4 a.m. She left the house at 5 a.m. to go to work.
           Sidina Mobley testified that she was in the vehicle when the driver received a gunshot
wound on December 2, 2003. She stated that she was confused as to who fired the shots
notwithstanding that she told the police that morning that Jose Borjon had fired the shots. 
 She thought that the white car was on the right side of the vehicle she was in while the red
car was in front. Mobley stated that she was not positive about anything that happened even
though she had stated otherwise in her statements to the police.
           Mobley testified that she saw Jose Borjon and two other men at the McDonald’s
restaurant when she and Saenz were in the BMW that afternoon. She identified Appellant
as being one of the men. She was nervous that night because she had taken money from
Borjon, and she thought someone was going to come after her. She knew the money
belonged to Appellant.
           The court instructed the jury that Sergio Diaz was an accomplice as a matter of law
and the court gave instructions as to how the testimony of that witness must be corroborated. 
Appellant requested that the jury charge indicate that Victor Devora was an accomplice
witness. This request was denied.
II. DISCUSSION
           In Issue No. One, Appellant asserts that the court erred when it failed to charge the
jury on Victor’s status as an accomplice as a matter of law and fact. Accomplice-witness
testimony is “inherently suspect.” Jones v. State, 982 S.W.2d 386, 389 n.5 (Tex. Crim. App.
1998). Therefore, the “accomplice-witness rule” provides that a conviction cannot stand on
accomplice testimony unless there is other evidence tending to connect the defendant to the
offense. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005); Vasquez v. State, 67
S.W.3d 229, 236 (Tex. Crim. App. 2002).
           An accomplice participates with a defendant before, during, or after the commission
of a crime and acts with the required culpable mental state. Kutzner v. State, 994 S.W.2d
180, 187 (Tex. Crim. App. 1999) (citing McFarland v. State, 928 S.W.2d 482, 514 (Tex.
Crim. App. 1996), cert. denied, 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997)). The
participation must involve an affirmative act that promoted the commission of the offense
with which the accused is charged. Id. An accomplice as a matter of law is one who is
susceptible to prosecution for the offense with which the accused is charged or a
lesser-included offense. Id.; Blake v. State, 971 S.W.2d 451, 454-55 (Tex. Crim. App.
1998). The trial court is under no duty to instruct the jury unless there exists no doubt or the
evidence clearly shows that a witness is an accomplice witness as a matter of law. Blake, 971
S.W.2d at 455. If the evidence presented by the parties is conflicting and it is not clear
whether the witness is an accomplice, then the trial court must leave to the jury the question
of whether the inculpatory witness is an accomplice witness as a matter of fact under
instructions defining the term “accomplice.” Id. A witness is not an accomplice simply
because he knew of the crime but failed to disclose it or even concealed it. Villarreal v.
State, 576 S.W.2d 51, 56 (Tex. Crim. App. 1978).
           An accused has the right to an instruction on any defensive issue raised by the
evidence whether that evidence is weak or strong, unimpeached or contradicted, and
regardless of what the trial court may or may not think about the credibility of the evidence. 
Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). When evidence from any source
raises a defensive issue, and the defendant requests a jury charge on that issue, the trial court
must submit the issue to the jury. See Muniz v. State, 851 S.W.2d 238, 254 (Tex. Crim.
App.), cert. denied, 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993). However, in
determining the application of a defensive instruction, one aspect of a witnesses’ testimony
“. . . cannot be plucked out of the record and examined in a vacuum.” Godsey v. State, 719
S.W.2d 578, 584 (Tex. Crim. App. 1986). The entire record must be examined for evidence
raising the issue of whether or not a particular witness is an accomplice. See Cruz v. State,
690 S.W.2d 246, 250 (Tex. Crim. App. 1985).
           In the present case, the record shows that Devora was not present at the time of the
drug transaction with Mobley. Further, there is no evidence that he was aware of the
transaction. Appellant was in the front seat of the Mustang when he showed the gun to Diaz. 
Evidence shows that Devora was in the backseat, and there was no evidence that he saw the
gun or that he was aware of Appellant’s intent to use it to scare Mobley. Appellant relies on
the testimony of the victim, who described seeing a flash which he guessed came from in
back of the driver. Appellant contends that this is evidence that Devora was the shooter. 
However, on cross-examination, the victim clarified his testimony and said he just saw a
flash, and because he was accelerating, he could not tell where it came from. In addition,
Appellant relies on the testimony of several police officers to the effect that it appeared that
the shot that was fired into the door of the victim’s vehicle was a straight-in shot. Officer
Julio Ordaz agreed that the shot trajectory would be consistent with someone holding a
handgun out level as they were driving by and firing. Appellant has taken this evidence
again to show that Devora was the actual shooter, and therefore should have been charged
as an accomplice. However, we find this evidence to be speculative and not supportive of
Appellant’s conclusion; it is not sufficient to warrant an accomplice instruction as a matter
of law or fact. Issue No. One is overruled.
           In Issue No. Two, Appellant argues the trial court erred when it failed to require the
jury to return a unanimous verdict on whether Appellant committed the offense by firing the
gun in question or whether he committed the offense by assisting in the commission of the
offense. Appellant also argues that the trial court erred when it failed to require that the jury
return a unanimous verdict with respect to what kind of aggravated assault was committed
under Count One of the indictment. Appellant did not object to the jury charge on these
grounds at trial. The charge read in part, concerning the manner of deliberation, “[i]n order
to return a verdict, each juror must agree to it” and “[y]ou shall not reach a verdict by lot or
by chance or by any other method except by a fair and impartial deliberation of the law and
the evidence.”         The application paragraph as to Count One, read in pertinent part:
Now if you find from the evidence beyond a reasonable doubt that on or about
the 2nd day of December, 2003 in El Paso County, Texas, the Defendant,
SAUL ROMERO, acting either individually or as a party as that term is herein
defined,
PARAGRAPH A
did then and there intentionally or knowingly or recklessly cause serious bodily
injury to RICARDO GOMEZ by shooting RICARDO GOMEZ with a firearm,
or
PARAGRAPH B
did then and there intentionally or knowingly or recklessly cause bodily injury
to RICARDO GOMEZ by shooting RICARDO GOMEZ with a firearm, and
the said Defendant, SAUL ROMERO, did then and there use or exhibit a
deadly weapon, during the commission of or immediate flight from said
assault, to wit: a firearm, or
PARAGRAPH C
did then and there intentionally or knowingly threaten RICARDO GOMEZ
with imminent bodily injury and did then and there use or exhibit a deadly
weapon, to wit: a firearm during the commission of said assault, then you will
find the Defendant, SAUL ROMERO, guilty of aggravated assault as alleged
in Count I of the indictment.

           When reviewing charge error, we employ a two-step analysis. Washington v. State,
930 S.W.2d 695, 698 (Tex. App.--El Paso 1996, no pet.). We must first determine whether
error actually exists in the charge. Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1984); Washington, 930 S.W.2d at 698. In making this determination, we view the charge
as a whole and our review is not limited to a series of isolated statements or portions of the
charge standing alone. Washington, 930 S.W.2d at 698; see Holley v. State, 766 S.W.2d 254,
256 (Tex. Crim. App. 1989). Second, we must determine whether sufficient harm resulted
from the error so as to require reversal. Almanza, 686 S.W.2d at 171; Washington, 930
S.W.2d at 698. Which harmless error standard applies depends upon whether the defendant
objected. Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex. Crim. App. 1994); Washington,
930 S.W.2d at 698. Where, as here, the defendant failed to object, he must show that he
suffered actual egregious harm. Almanza, 686 S.W.2d at 171; Washington, 930 S.W.2d at
698. Where there has been a timely objection made at trial an appellate court will search
only for “some harm.” Abdnor, 871 S.W.2d at 732; Almanza, 686 S.W.2d at 171. Under
Almanza, we examine the error in light of (1) the entire jury charge, (2) the state of the
evidence, including the contested issues and the weight of the probative evidence, (3) the
arguments of counsel, and (4) any other relevant information. Almanza, 686 S.W.2d at 171.
           Jury unanimity is required in felony cases. Tex. Code Crim. Proc. Ann. art. 36.29(a)
(Vernon Supp. 2006); Tex. Code Crim. Proc. Ann. art. 37.03 (Vernon 1981). In this
context, unanimity means that each and every juror agrees that the defendant committed the
same, single, specific criminal act. Ngo v. State, 175 S.W.3d 738, 745 (Tex. Crim. App.
2005). In reviewing a disjunctive jury charge, we first determine whether the application
paragraphs contain different criminal acts or whether they merely instruct as to different
means of committing a single offense. Holford v. State, 177 S.W.3d 454 (Tex. App.--Houston [1st Dist.] 2005, pet. ref’d). If the disjunctive paragraphs contain different criminal
acts, then the jury must be instructed that it cannot return a guilty verdict unless it agrees
unanimously that the defendant committed one of the acts. Id. at 461 (citing Ngo, 175
S.W.3d at 744 (holding that because defendant was charged with three different criminal acts
of credit card abuse, jury had to unanimously agree that defendant did at least one of three
different things: steal the credit card, knowingly receive the stolen credit card, or fraudulently
present stolen credit card with intent to obtain benefit)). But if the disjunctive paragraphs
merely inform the jury of different means of committing a single offense, then the jury does
not have to unanimously agree on which alternative means the defendant used to commit the
offense. Holford, 177 S.W.3d at 462 (citing Kitchens v. State, 823 S.W.2d 256, 258 (Tex.
Crim. App. 1991)).
           In Marinos v. State, 186 S.W.3d 167, 174 (Tex. App.--Austin 2006, pet. filed), that
court held, citing Ngo v. State, 175 S.W.3d 738 (Tex. Crim. App. 2005), that the trial court
erred by failing to require a unanimous verdict finding the accused guilty of either aggravated
assault by bodily injury or aggravated assault by threat as each allegation constituted a
different offense. See also Gonzales v. State, 191 S.W.3d 741, 748 (Tex. App.--Waco 2006,
no pet.). Accordingly, in this case, the court erred in submitting the three different
allegations of aggravated assault without requiring a unanimous verdict on one of the
allegations.
           An unpreserved complaint about a charge error in a criminal case is reviewed for
“egregious harm.” Almanza, 686 S.W.2d at 171-72 (op. on reh’g). Because trial counsel did
not timely object to the charge, Appellant must show that he suffered egregious harm, a
difficult standard that is determined on a case-by-case basis. Ellison v. State, 86 S.W.3d 226,
227 (Tex. Crim. App. 2002). Errors that result in egregious harm are those that affect “the
very basis of the case,” deprive the defendant of a “valuable right,” or “vitally affect a
defensive theory.” Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (citing
Almanza, 686 S.W.2d at 172). The harm to an accused must be actual, not just theoretical. 
Almanza, 686 S.W.2d at 174. In deciding whether egregious harm exists, we look at (1) the
charge itself, (2) the state of the evidence, including contested issues, (3) the arguments of
counsel, and (4) any other relevant information revealed by the record of the trial as a whole. 
Hutch, 922 S.W.2d at 171; see Ngo, 175 S.W.3d at 749.
           In the present case, the prosecutor argued in closing argument that the jurors did not
have to concur on each paragraph as long as all twelve jurors believed that at least one of the
paragraphs had been proven by the State beyond a reasonable doubt. That statement
accentuated the charge error. Marinos, 186 S.W.3d at 176. Further, the statement in the
charge that each juror must agree to the verdict, did not serve to cure the error. Id. at 175. 
           However, regarding the contested issues at trial, each paragraph required that
Appellant used a firearm, which was described as a deadly weapon. The contested issue at
trial was whether or not Appellant was the shooter. His defensive posture was that he was
at home at the time of the shooting. None of the paragraphs are mutually exclusive. There
was no question at trial that the complainant suffered serious bodily injury and that a deadly
weapon was used. Accordingly, we find that Appellant did not suffer egregious harm as a
result of the erroneous charge. See Gonzales, 191 S.W.3d at 751. Issue No. Two is
overruled.
           In Issue No. Three, Appellant argues the trial court erred when it allowed the State to
present evidence that Mobley and Appellant were involved in a transaction in which she took
a sum of money for a product without providing the product.
           Prior to the presentation of evidence, Appellant asked the judge to exclude evidence
that he had been involved in the purchase of cocaine with one of the complainants, Sidina
Mobley, and that Mobley had taken the money without providing the drugs. Appellant urged
the court to exclude the evidence on the basis that the probative value of such evidence
would be outweighed by its prejudicial effect. The trial court ruled that the State could say
a transaction to purchase something fell apart because Mobley did not produce the purchased
product, and they went after her. Appellant argues the evidence was unnecessary and
extremely prejudicial since Romero’s defense was that he was not in the car at the time of
the offense.
           Tex. R. Evid. 404(b) states that evidence of other crimes, wrongs, or acts is not
admissible to prove the character of a person to show action in conformity therewith. But
the “other crime, wrong, or act” may have relevance “apart from character conformity; that
it tends to establish some elemental fact, such as identity or intent; that it tends to establish
some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an
elemental fact; or that it rebuts a defensive theory by showing, e.g., absence of mistake or
accident.” Wyatt v. State, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (citing Montgomery v.
State, 810 S.W.2d 372, 388-89 (Tex. Crim. App. 1990) (op. on reh’g)). Additionally, same
transaction contextual evidence may be admissible where “several crimes are intermixed, or
blended with one another, or connected so that they form an indivisible criminal transaction,
and full proof by testimony, . . ., of any one of them cannot be given without showing the
others.” Id. (citing Rogers v. State, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)). The Court
of Criminal Appeals has held that “it has long been the rule in this State that the jury is
entitled to know all the relevant surrounding facts and circumstances of the charged offense;
an offense is not tried in a vacuum.” Moreno v. State, 721 S.W.2d 295, 301 (Tex. Crim. App.
1986).
           Under Rule 404(b), however, same transaction contextual evidence is admissible
“only to the extent that it is necessary to the jury’s understanding of the offense.” Pondexter
v. State, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996). It is admissible only “when the
offense would make little or no sense without also bringing in the same transaction
evidence.” Id.
           We conclude that the trial court did not err. The evidence of the product transaction
was so intertwined with the aggravated assault that the jury’s understanding of the offense
would have been obscured without it. Further, admission of the product transaction evidence
tended to establish some evidentiary fact, such as motive, opportunity, and preparation. Id. 
In the instant case, the State’s theory was to prove that the aggravated assault was intentional
by showing that the product transaction and Mobley’s subsequent failure to deliver the
product was the motive for the aggravated assault. See Wyatt, 23 S.W.3d at 25.
           Appellant asserts the evidence was more prejudicial than probative. The Texas Rule
of Evidence Rule 403 balancing test includes the following factors:
(1) how compellingly the extraneous offense evidence serves to make a fact
of consequence more or less probable-a factor which is related to the strength
of the evidence presented by the proponent to show the defendant in fact
committed the extraneous offense;
(2) the potential the other offense evidence has to impress the jury “in some
irrational but nevertheless indelible way;”
(3) the time the proponent will need to develop the evidence, during which the
jury will be distracted from consideration of the indicted offense;
(4) the force of the proponent's need for this evidence to prove a fact of
consequence, i.e., does the proponent have other probative evidence available
to him to help establish this fact, and is this fact related to an issue in dispute. 

           Id. at 26.

           This Court will reverse only upon a clear abuse of discretion. Ransom v. State, 920
S.W.2d 288, 299 (Tex. Crim. App. 1994); see also Montgomery, 810 S.W.2d at 390 (stating
that “so long as the trial court . . . operates within the boundaries of its discretion, an
appellate court should not disturb its decision, whatever it may be”).
           First, we note that the evidence presented by the prosecution to show the drug
transaction was necessary for the jury to understand Appellant’s actions and motive. 
Additionally, the trial court limited reference to the drug transaction by only allowing the
State to say a transaction to purchase a product. Therefore, it is unlikely that the jury would
convict Appellant solely for being a criminal. Further, the evidence was important to the
prosecutors’ contention that Appellant intentionally committed the aggravated assault and
that said assault stemmed from the transaction gone bad. Any evidence presented by the
State is generally prejudicial to the defendant; however, because the two crimes here were
so intertwined, the evidence of one was necessarily probative of the other. In light of these
facts, we hold that the trial judge did not abuse her discretion in concluding that the danger
of unfair prejudice did not substantially outweigh the probative value of this evidence. See
Montgomery, 810 S.W.2d at 387. Issue No. Three is overruled in its entirety.
           In his fourth issue, Appellant asserts the trial court erred when it denied Appellant’s
request for a mistrial after the State referred to a drug deal in violation of the court’s order
that it not do so. On direct examination of Sergio Diaz, the prosecutor asked the following
question; “Let’s back up for a second, Mr. Diaz, and talk about the different cars that
everyone was in during the drug--excuse me--during the product transaction.” Appellant
objected and requested a mistrial on the basis that a curative instruction would be futile. The
court sustained the objection on the grounds that the State’s question violated a motion in
limine and warned the prosecutor. The court denied the request for a mistrial and instructed
the jury to disregard the prosecutor’s question. The judge expressed her belief that it was a
mistake and not intentional.
           A mistrial is a device used to halt trial proceedings when error is so prejudicial that
expenditure of further time and expense would be wasteful and futile. Thus, a trial court may
properly exercise its discretion to declare a mistrial if an impartial verdict cannot be reached,
or if a verdict of conviction could be reached but would have to be reversed on appeal due
to an obvious procedural error. Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). 
The determination of whether a given error necessitates a mistrial must be made by
examining the particular facts of the case. Id. The asking of an improper question will
seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction
to disregard. Id. A mistrial is required only when the improper question is clearly prejudicial
to the defendant and is of such character as to suggest the impossibility of withdrawing the
impression produced on the minds of the jurors. Id. A trial court’s denial of a mistrial is
reviewed under an abuse of discretion standard. Id.
           An instruction to disregard an impermissible question generally cures any prejudicial
effect. See Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). In assessing the
curative effect of a court’s instruction to disregard, the correct inquiry is whether, in light of
the record as a whole, the argument was extreme, manifestly improper, injected new and
harmful facts into the case, or violated a mandatory statutory provision and was thus so
inflammatory the instruction to disregard was ineffective. Id. at 115-16. We do not find that
the question was so inflammatory as to be incurable by an instruction to disregard. The jury
was certainly aware of purported theft of the money given to Mobley, and the issue of drugs
was collateral to the actual charges upon which Appellant was being tried. We discern no
abuse of discretion in the trial court’s denial of the motion for mistrial. We overrule Issue
No. Four.
           In Issue No. Five, Appellant asserts that the evidence is legally and factually
insufficient to support the conviction. Specifically, Appellant contends that the jury should
have been instructed that Devora was an accomplice; as such, there was insufficient evidence
to corroborate Diaz’ and Devora’s testimony. We note that we have held that the court did
not err in failing to give accomplice witness instructions regarding Devora’s testimony. 
Furthermore, when reviewing evidentiary sufficiency, the court must consider all of the
evidence presented, whether properly or improperly admitted. Miles v. State, 918 S.W.2d
511, 512 (Tex. Crim. App. 1996).
           In reviewing the legal sufficiency of the evidence, we are constrained to view the
evidence in the light most favorable to the judgment to determine whether any rational trier
of fact could find the essential elements of the offense, as alleged in the application
paragraph of the charge to the jury, beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Butler v. State, 769 S.W.2d 234, 239 (Tex. Crim.
App. 1989); Humason v. State, 728 S.W.2d 363, 366 (Tex. Crim. App. 1987). More
particularly, sufficiency of the evidence should be measured by the elements of the offense
as defined by the hypothetically correct jury charge for the case. Malik v. State, 953 S.W.2d
234, 239-40 (Tex. Crim. App. 1997).
           Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable
doubt. Stoker v. State, 788 S.W.2d 1, 6 (Tex. Crim. App. 1989), cert. denied, 498 U.S. 951,
111 S.Ct. 371, 112 L.Ed.2d 333 (1990); Dwyer v. State, 836 S.W.2d 700, 702 (Tex. App.--El
Paso 1992, pet. ref’d). We do not resolve any conflict in fact, weigh any evidence or
evaluate the credibility of any witnesses, and thus, the fact-finding results of a criminal jury
trial are given great deference. Menchaca v. State ,901 S.W.2d 640, 650-52 (Tex. App.--El
Paso 1995, pet. ref’d); Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992);
Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); Leyva v. State, 840 S.W.2d
757, 759 (Tex. App.--El Paso 1992, pet. ref’d); Bennett v. State, 831 S.W.2d 20, 22 (Tex.
App.--El Paso 1992, no pet.). Instead, our only duty is to determine if both the explicit and
implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial
in the light most favorable to the verdict. Adelman, 828 S.W.2d at 421-22. In so doing, we
resolve any inconsistencies in the evidence in favor of the verdict. Matson, 819 S.W.2d at
843 (quoting Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). The trier of
fact, not the appellate court, is free to accept or reject all or any portion of any witness’s
testimony. Belton v. State, 900 S.W.2d 886, 897 (Tex. App.--El Paso 1995, pet. ref’d).
           In conducting a factual sufficiency review, we view the evidence in a neutral light to
determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. 
We set aside the fact finder’s verdict only if (1) the evidence supporting the verdict, when
considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) evidence contrary to the verdict is strong enough that the beyond-a-reasonable-doubt
standard could not have been met. Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim.
App. 2004). However, our factual sufficiency review must be appropriately deferential so
as to avoid substituting our judgment for that of the fact finder. Clewis v. State, 922 S.W.2d
126, 133 (Tex. Crim. App. 1996). Accordingly, we are authorized to set aside the jury’s
finding of fact only in instances where it is manifestly unjust, shocks the conscience, or
clearly demonstrates bias. Id. at 135. If the evidence is factually insufficient, we remand to
the trial court for a new trial. Id. at 133-35.
           In the instant case, evidence was presented that Appellant gave Junior a sum of money
to purchase cocaine from Mobley, and that Mobley took the money without delivering the
drugs. The Appellant picked up a gun and said he wanted to scare Mobley to get his money
back. Appellant with the help of somebody in a white car, located the BMW Mobley had
been seen in. Diaz testified he pulled up next to the BMW, was driving about 80 miles per
hour, and then heard gun shots. Diaz said he then saw Appellant getting back into the car
from the window, and he had the gun in his hand.
           Devora testified that he saw Appellant pull out his hand and start shooting. Although
he did not see the gun because he bent down when Appellant started shooting, he testified
that he believed Appellant was the person shooting. Devora was not an accomplice in the
offense and we find his testimony sufficient to corroborate Diaz’ accomplice testimony.
           Appellant presented testimony from his mother and Carla Hernandez to the effect that
Appellant was at home the entire evening of the instant offense and therefore could not
possibly have committed the offense. The credibility of the witnesses was an issue for the
jury as the sole judge of the weight and credibility to attach to each witness. The trier of fact,
not the appellate court, is free to accept or reject all or any portion of any witness’s
testimony. The jury could have reasonably disregarded the testimony of Carla Hernandez
and Appellant’s mother. Consequently, we find the evidence legally and factually sufficient
to support the jury’s guilty verdict in the instant case. Issue No. Five is overruled.
           In Issue No. Six, Appellant argues that the court erred when it denied his request for
a mistrial after the prosecutor asked a witness if she knew that Appellant had been arrested
for battery of a family member. Appellant’s brother testified at the punishment phase on
Appellant’s behalf. On cross-examination, the prosecutor inquired if Appellant’s brother was
aware of Appellant’s criminal history. He said that he was aware of Appellant’s criminal
record but was not aware that Appellant had been in trouble in New Mexico. The prosecutor
asked if Appellant’s brother was aware of two specific offenses and he replied that he was. 
Then the prosecutor asked, “[d]id you know that in August of 2000 in Dona Ana County,
New Mexico, he was arrested by the Sunland Park Police Department and charged with
battery on a family member?” Appellant objected to the question on the basis that the
charges had been dismissed. The trial court sustained Appellant’s objection, instructed the
jury to disregard the last question, and denied Appellant’s request for a mistrial.
           Again, a mistrial is required only when the improper question is clearly prejudicial to
the defendant and is of such character as to suggest the impossibility of withdrawing the
impression produced on the minds of the jurors. Ladd, 3 S.W.3d at 567. An instruction to
disregard an impermissible question generally cures any prejudicial effect. See Wesbrook,
29 S.W.3d at 115. In assessing the curative effect of a court’s instruction to disregard, the
correct inquiry is whether, in light of the record as a whole, the argument was extreme,
manifestly improper, injected new and harmful facts into the case, or violated a mandatory
statutory provision and was thus so inflammatory the instruction to disregard was ineffective. 
Id. at 115-16. Looking at the record as a whole and given the fact that it was established that
Appellant had a criminal history, we find the instruction to disregard cured any error that may
have occurred. Issue No. Six is overruled. 
           In Issue No. Seven, Appellant argues that during the punishment phase, the trial court
erred when it overruled his relevance objection and his Texas Rules of Evidence Rule 403
objection to questions asked by the State of Ricardo Gallegos, a defense witness, regarding
a charge that had been dismissed. As a character witness for the defense, Gallegos testified
at punishment that he had known Appellant for about fifteen years, that they had gone to
school together, and had played sports in school. Gallegos stated that Appellant was a good
kid, that he was “into sports,” and that they had played baseball and football together. When
Appellant asked him if there was something he would like to say to the jury, Gallegos asked
for “clemency,” and stated that Appellant was a good father, that his children needed him,
and that he was a nice guy, and a good worker.
           On cross-examination, the prosecutor said, “Let’s talk about the kinds of things you
and Mr. Romero were doing in 1998 together, and 1999. Do you remember those years?” 
When Gallegos indicated he did, she asked him what kind of things they were doing together,
and Gallegos responded, “We hang out.” The prosecutor then asked, “Were you arrested
together?” Gallegos answered, “yes.”
           At a bench conference, Appellant objected to talking about the arrest since the charges
were dismissed, and lodged a relevance objection under article 37.07. The trial court ruled
that the prosecutor could question the witness about the events that led up to the arrest. 
Appellant again stated the case was dismissed, and the judge replied, “That can come out,
too.” Appellant then objected to the evidence being more prejudicial than probative. The
trial court overruled the objection.
           Gallegos testified that they were partying, were at a party, and he remembered that a
guy tried to run over them. He denied that Appellant beat up a kid, and took a tool box. 
Gallegos said he was acquitted of those charges, and denied that charges were dismissed
because the kid did not show up for trial.
           While “[e]vidence of a person's character or character trait is not admissible for the
purpose of proving action in conformity therewith on a particular occasion,” the accused in
a criminal case may place his character in issue by offering evidence of his good character. 
Tex. R. Evid. 404(a)(1)(A). By placing his character in issue, however, the accused “opens
the door” for the State to rebut evidence of his good character with its own evidence of the
accused’s bad character. On cross-examination, the State may test the character witness’s
familiarity with the defendant’s character or demonstrate that the witness has a low standard
for what he considers good character by inquiring into prior specific instances of conduct that
are inconsistent with the particular character trait, but the State may not offer extrinsic
evidence regarding the prior incidents solely to show the character witness is “wrong” in his
opinion. Tex. R. Evid. 405(a).
           Appellant argues the evidence presented by the State had no probative value since the
witness answered that none of the offenses had occurred. We disagree. By raising the
defensive theory that Appellant was a nice guy, or of good character, Appellant (through
Gallegos) opened the door for the State to cross-examine him regarding an extraneous
offense if the extraneous offense would tend to correct the false impression left by the
witness’s direct examination testimony. See Wheeler v. State, 67 S.W.3d 879, 885 (Tex.
Crim. App. 2002). We find that the court did not err in admitting the complained-of
testimony. Issue No. Seven is overruled
           Having overruled each of Appellant’s issues on review, we affirm the judgment of the
trial court.
                                                                  RICHARD BARAJAS, Chief Justice

August 24, 2006

Before Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)